Counselor texie, Pallant, co-operative Christine ish, Carolines, A lunch. 까 Hello. Hello to you. Please identify yourself. I really appreciate letting me come here because you said in one of your rulings you think this could be handled without me coming. You need to start by saying your name, please. Richard texie. I'm glad I came because you'll find out maybe you already know what happened the other day. We already won. But we'll talk about that in a minute. Let's talk about it now. How much time do you want to reserve for rebuttal? What happened is... No, listen to me. You have to reserve some time for rebuttal. You get an opportunity to have the last word. And sometimes people find that to be very advantageous. We're going to reserve five minutes for your rebuttal, okay? I understand. Okay, so now you've got ten minutes. Please proceed. Okay. Here's what happened. My wife went bankrupt. She owed money on a house in Bel Air, if you know where that is. It was a big house, almost 8,000 square feet on two acres of land and she owed a million dollars on it. She inherited a lot of money when her mother died, like several hundred thousand dollars. But when we needed money to send the kids to school, they went to big schools. She borrowed money on the... She thought she sold stock enough to do it, but her broker borrowed on it. She didn't know the difference. I didn't even know she did it. But what happened is when the margins came in, we didn't have the money and she lost everything. So we were behind... It was behind $100,000 in payments on that loan. A friend of ours was a lawyer and they started foreclosure. People started foreclosure on the loan, the bank, back east. And my wife, we had a friend of my family, I've known him for years, a lawyer, and he said, listen, file a Chapter 13, you can get refinance and do that. So she did. He wrote the papers out, she signed them, and the judge didn't show up... The lawyer didn't show up in the hearing. He didn't show up, file it again. So it looked like she's a filer, you know, what do you call it, a bad person. A serial... Serial filer, yeah. So then the last thing she had was file a Chapter 11, and that's a little hard for my wife. My wife is a doctor of psychology. Anyway, what happened is it went to a Judge Bossom, who we didn't know, and without a doubt, filed Chapter 11 in 1987. I know why, because somebody that hates me filed all kinds of stuff in there, because I went bankrupt in 1987, and there were millions of dollars worth of phony claims against me. I had a lawyer, I fired him, and then I went and got them all dismissed, and I got a discharge. Some of those people didn't like it. Anyway, but I don't want to spend a lot of time on that, because this is this case. This case is about a trustee that wants to get money, more money. In my wife's case, they billed over a million dollars in the first little over a year, and they've got another claim in. They sold the house for $2.5 million. It's a long story why they sold it, but they did. And this is all about money. Now, this particular case, they want to prove that I own the Dwarf Co. And if you read the paper that I assume you did, I think it's clear, as clear as you'll ever be, that I don't own it, because my brother owns it. He didn't form the corporation. He bought it. It was about a movie. That's why it's Dwarf Co. Productions. He found out the woman that had it was a very nice lady. I met her, but maybe she didn't know it, but there were liens against that movie. And it was a pretty good-looking movie. They had a reel. You can look it up on the Internet today. It just never got made. So my brother, when he found out there were liens from the actors union or something based on that reel, he said, forget it. It's just not worth it. And the corporation just sat there for a while, and then after about three or four years, we had a corporation. That's what we call the Dwarf Co.  That was 28 years ago is when this happened. He's been paying the fees. It's never been revoked. If it was revoked, we couldn't even be here. In fact, you can't even get things out of a corporation when it's revoked. Not so easy. You lose it. But it's never been revoked. Now, here we are. I have absolute confidence that there's no way that we could lose this case, except these people are very good. I read their response. It's beautifully written, except it's completely wrong. And I can go over a few things because it's kind of truthfully ridiculous. They said that it was late, and they were late. My brief was filed, I think it  year. They filed their brief in May of this year. And they were late. And they were late.  It's been a long time. It's been May 10th of this year. It's a long time. You're not supposed to have that long. But whether it was late or not late, it's here. And all I want to tell you is that there's no possible way that they could prove that I don't know. One thing I want to tell you that's important. I didn't even want to talk so much. But my brother wanted a lawyer because he went before the BAP on another case and won. A big case. It was great. He paid the lawyer $25,000. He can't afford it. My brother has Parkinson's disease. He just had a kidney removed about a month ago. He's got cancer. He's got pneumonia in the hospital. And worse than that, he's very depressed. And he's only 22 months younger than I am. I'm 78 years old. And I have old man's voice now, you know. It's just one of those things. But my brother was very worried about this whole thing, and I said, listen, the best way for me to prove that I don't own it is to prove that you own it. How could I prove I don't own it? So that's what I did. I proved that I don't own it. He owns it. That's basically it. And now we'll get to the other part because you might want to rebuttalize. This is not so much rebuttal. Last week, about 10 days ago, the trustee had filed a motion to sell that note, which is what they're trying to get here, to sell it in the judge's court. I found out about it, and I said, I don't understand it because we have this hearing here 10 days later. And I went to see the judge, and I didn't fill out the papers right. I gave them the proof that this hearing was happening, and they wouldn't even show it to them because I didn't go and record it with the whatever, you know, the clerk. I came back a couple days later. I came back right before the hearing, and I made sure he got it, and he read it, and he said, I read your papers. And Mr. Dumas, who's this is his partner, Mr. Dumas looked at it and he felt pretty bad. He said, Your Honor, this isn't about Richard Taxi. This is about Ronald Taxi. And the judge said, okay, let's sell it. So they had an auction. Took about an hour. Started with $100,000 and went up to $500,000. And that's what happened. They sold it. It's not going to work because what the judge said, even in his ruling here, he said a lot of things. He said, My wife testified of certain things. My wife has never testified anything about community property or anything. They took her deposition on something else, and we won that too. But anyway, it's just traditional. You said you won last week. How do you turn? Well, we won because I wanted it to be my brother's. This whole thing was for me to prove it's my brother's. Well, they said it's your brother's, and they sold it. The trouble is, it won't work because what the judge said in his ruling is very simple. He said, You've got to prove that Richard Taxi owns it. He didn't get it as a gift. It was community property. We never had community property from the day we got married on purpose. I didn't want to have community property. My wife had her own car, her own house, everything. And that's what happened. So now they're going to have to prove that it's mine and community. They can't do it. My brother, they can't get it from him. He's a corporation in Nevada. The judge had no business even going there and trying to do an alter ego theory that I own it. It just can't be done. And the judge, by the way, it's not really his fault. He took over from another judge, Judge Nider. You may know of him. Very nice guy, except he had dementia. You probably know that, too. Nobody else seemed to publicize it, but he did. And he made a lot of, some good rulings and some bad rulings. And when this judge took it over the first time we met with him, you know, the whole, he said, I don't know anything about this case. So he got into this late. And a nice guy, but he just, I don't know what happened when I showed him those papers. And then he said, then Mr. Dumas said, what about this, the note? We want to get the note so we can, so these people can foreclose. And he said, you better, you have to do something else. How are you going to, you have to have another case against Ronald Taxi. So, but anyway, I want to know and I'll do it in rebuttal, I guess. I'll wait. I just think there's something that should be done about this because these people absolutely are not telling the truth. And you can, I mean, I could go over every single thing in there about being late and I'm a crook. And by the way, I did go to jail in 2000 and when I was convicted in 1974 for copyright infringement, the first person ever to go to trial, I could have pled guilty and got a $10,000 fine and probation. I didn't do it because I wasn't guilty, really. I don't, maybe I was, but I don't think I was guilty. I didn't copy things. I changed them around and whatever it is, it's a pretty big business and I learned a lot. I mean, it was one of the best experiences of my life. I had a four-year sentence. I got out in one year because I proved to the other hired people that I should get out earlier, but I had a good time and I learned a lot. You have five minutes left. Why don't you sit down and we'll hear from your colleague and I'll call you back up. I'll rebuttal a little longer, but I don't think I have to. Well, you've got some more time and I suspect you'll come back and talk to us some more. Counsel, please identify yourself. Good morning, Your Honor. This is Christian Kim on behalf of the appellee, Caroline Adai. Please proceed. Thank you, Your Honor. First of all, Your Honor, all the comments that Mr. Taxi made about the Bel-Air house and how the fees were too high and all that, that's not before the court today, obviously, but Mr. Taxi has filed, by my count, six separate appeals in conjunction with this bankruptcy case, and that's why the fees are so high as they are. But in any case, with respect to the sale order, Your Honor, that has nothing to do with this appeal, frankly. There is no stay pending appeal that was granted by the bankruptcy court. What case was that sale approved in? This case, the Kellogg Taxi case? Yes, Your Honor. It was approved and the order hasn't actually been entered yet, but the sale was approved at the bankruptcy court. There is no stay, so there's no reason why that sale can't proceed. But the main, the crux of this case, Your Honor, is that Mr. Taxi is trying to basically relitigate the merits of the case that took place before the bankruptcy court back in, I believe it was early 2017. In that trial, Your Honor, the findings that Mr. Taxi owned Dwarf Co. because for many reasons, including the fact that he managed the company, he took money from the company whenever he wanted, as long as it didn't make the company, quote unquote, vulnerable. And the money that was taken off from the company were all used for his personal expenses. Now, the bankruptcy court made those factual findings based on Mr. Taxi's own testimony at the time, in addition to his declaration that he filed in opposition to the motion for preliminary injunction that was filed in the same adversary proceeding. His brother, Mr. Ronald Taxi, also testified that Mr. Richard Taxi received money and was entitled to money because he was running the company. In terms of Mr. Taxi's statements that there were no findings of community property, that, in fact, is wrong, Your Honor. The bankruptcy court did find that the note was community property. Ms. Kathleen Kellogg Taxi, in her prior Chapter 13 bankruptcies in two separate schedules, stated under oath that Dwarf Co. was property of the state. Now, based on those documents, the bankruptcy court made the proper finding that Dwarf Co. Productions, and therefore this state of trust, is property of Kathleen Kellogg Taxi's bankruptcy case. Mr. Taxi also seems to think that throughout their whole marriage there was never any property that was considered community property, but as stated, as in the record, there was no marital agreement. They've been married since 1984, and any property that's acquired during the marriage is community property, as you know. So that argument, Your Honor, is just without merit. And lastly, Your Honor, I just want to just point out that Mr. Taxi's allegations that Judge Nider somehow had dementia or anything like that, there is no record or evidence of that anywhere in the record, and we would certainly think that that's certainly not a relevant consideration for the court in Thank you, Counsel. Thank you. Are there any questions for Counsel? No, no questions. You may be excused. Sir, you have four minutes and 52 seconds. I'll hold you to it. I did not understand a word he said, to tell you the truth. It's not his fault. It's my fault. But I heard he said something about the other bankruptcy courts already ruled on this. No, no. I asked him which case the sale of the note was approved in, which bankruptcy case, and he said it was in the Kellogg Taxi, your wife's bankruptcy case. What did he say was approved? The sale of the promissory note, the $500,000 sale you were talking about. He said it happened in the Kellogg Taxi bankruptcy case. Well, this whole thing happened in the Kellogg. Okay, all right. It's all the same one. Okay. So, yeah, but the one they're selling is this note. Right, right. Same note. I understand. And I say, what are we doing here? I mean, and why did Mr. Dumas do that? Because he didn't think I could do anything about it or know about it. And the judge, I have to give him, he just didn't know what was going on. I mean, the judges today are completely overworked. He had like 50 cases in one day, and he has a staff of young people. It's like six people. I see them there. They're in their 20s. Maybe they're lawyers. Maybe they're great. But this is not easy stuff. And all I'm saying is, here's what I want to ask you. Do you have the right to sanction people? Have you ever done that? I mean, I think what they did was just wrong. Give the money to charity. It's just wrong. This cost me a lot of time, a lot of. Plus, the worst thing, my brother thinks these people have too much money. We've lost a lot of notions. But they're coming. I'm spending all the time defending. Now I'm about done. They want to get rid of this case. Wait till you see what happens, because you'll read about it in the papers one of these days. This was millions of dollars. The trustees sold the house for a bank who had the mortgage, who had the money. That never happens. A trustee is supposed to work for unsecured creditors. My wife had three of them. One was for $10,000, a credit card that was current. I paid it off. The second one was for a car my daughter returned, and it had some wear and tear, $1,100. And a third was for a judgment for $25,000. It was not a judgment. It was something she couldn't pay, and they sold it to a collection agency. And they offered to do it for half. So I said, oh, let's pay them. I have somebody that will give us the money, a friend. And she said, we'll do it, but  approval. So my wife had a top lawyer, Greg Silvato, who used to work with Parker Milken, a great guy. And he said to the trustee, you know, we'll pay it. She said, no, give me the money, and I'll pay it. We wouldn't do that. So $25,000 was deposited in his trust account. There was no stay on this, so the people couldn't even collect it if they wanted to. There's nothing filed. My wife's still going to pay them. And now she owes Greg Silvato $380,000, because this guy is, he said, this case should be over in a month. But what happened is when we were, everything was paid off. By that time, their fees were $200,000. Their fees were going up at well over $1,000 a day. And that's the truth. It's an unbelievable case. Nothing to do with you in this case. But it's just, now it's time for us to get even. And not even even. It's my whole, you know, I'm living in a shack now in Brentwood, a nice area. But my mother, my brother's wife's mother died, and it's a tear-down house. I mean, we had rats in there. In fact, there was a watsnest in the laundry room. I never saw that before. I didn't know it was a watsnest. But anyway, it's hard on my wife, but my wife is just the best. I mean, you have no idea how lucky I am. My kids are terrific. My son's a writer, and you'll remember his name, Max Taxi. And one day you'll see the Academy Awards, and he'll be there, because he's doing well. And my daughter is a school teacher. She went to Columbia and put herself through. And my son is on Writers Guild, and my wife, did you ever hear of the Museum of Tolerance? It's a big deal out here. It's not only about the Holocaust, but about everything. She's Catholic and religious, and I'm Jewish and not a bit religious. But she gives tours there every Friday. She works for charities. She takes people and charges them $20 an hour. People are suicidal. I'm very lucky. Forget. But my brother, he wants to kill himself. He really does. He told me, I hope I don't wake up from the operation. Really bothers me. And this is about, not even about the money. It's about hope. And I'm positive it's going to end up okay. But lucky I've... That's right. Nothing else I can say. If you think about... Do it. Thank you very much for your presentation. Thank you very much.
judges: Kurtz, Faris and Spraker